# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     **Plaintiff,**

**vs.**                                **CR. 99-1264 JP**

**MARK RENDLEMAN,**

     **Defendant.**

## MEMORANDUM OPINION AND ORDER

On January 6, 2000 Defendant filed a motion to suppress (Doc. No. 27).  By an order filed June 5, 2000 following a hearing, I ruled on all issues, save one, raised in the motion to suppress. Also following the hearing, Defendant moved to supplement the record (Doc. No. 62).  The motion to supplement the record will be denied.  The remaining issue with respect to the motion to suppress is resolved in Plaintiff's favor and the motion to suppress will therefore also be denied.

I.      Background

The remaining issue in the motion to suppress is whether officers were legally on Defendant's premises in Embudo, New Mexico on October 7, 1999 when they seized two of three silencers that form the basis of this prosecution.  Defendant argues that the two Embudo silencers were the product of an illegal entry into the curtilage of his Embudo house on October 6, 1999 when officers went to view that house in order to more particularly describe in a search warrant the place to be searched.  I heard extensive testimony on whether officers impermissibly invaded

Defendant's curtilage.  At the close of evidence I asked the parties to brief whether officers had

sufficient information to describe particularly the place to be searched before they entered into the

area Defendant claims as curtilage and whether that independent information can even be

considered if officers did later invade Defendant's curtilage in order to particularly describe the

place to be searched.

      A.      Officers did not invade Defendant's curtilage

      Defendant's Embudo house lies in a sparsely populated, pretty setting typical of northern

New Mexico.  Defendant owns quite a bit of land surrounding his house and all of it is some

distance from the nearest paved road.  The house has no postal delivery or rural route number.

The dirt road leading to the house is used by roughly twenty households and is signed as private

at various points.  Defendant owns part of the road which others, including employees of utility

companies, use.  Defendant's house lies at the end of one of the road's several forks.  Until his

arrest, Defendant used the Embudo house only part time.  He did not occupy it on October 6,

1999

      Defendant asserts a privacy interest in an expanse demarcated as curtilage by a green line

drawn on Defendant's exhibit AW during the course of the suppression hearing.  AW is a scaled

map of Defendant's Embudo house and the surrounding area within roughly a 200 to 400 foot

radius.  On the west, the green line on AW represents an intermittent barbed wire fence in

disrepair.  On the northwest, north, and northeast, it depicts cliffs or hills extending up from the

floodplain of the Rio Grande.  The river forms the border from the northeast to south-southwest.

The only land vehicle entrance to the claimed curtilage is from the west along an unpaved

driveway.  A few old boards form a rickety gate on the south side of the driveway at the threshold

2

of the green line.  Beyond the boards, to the east, the drive forks immediately.  The high fork of the driveway splits north and ends a few feet below the southwest corner of the house.  The low fork extends to the south and east past a guesthouse and a studio or workshop-type structure, ending near a beach on the bank of the river.  Neither driveway fork is vividly marked and even the Defendant himself hesitated to describe them as roads.

On October 6, 1999 four law enforcement officials, Investigators Karen Yontz and Cynthia Romero of the Santa Fe County District Attorneys office and Sargent Joe Martinez and Officer Joe Schiel of the New Mexico State Police, set off for Defendant's Embudo house riding in Sergeant Martinez' police car.  Their aim was to gather a description of the house so as to particularly describe it in a warrant for which they already had probable cause.  After one wrong turn and a stop for directions at a neighbor of Defendant's, the four officers eventually crossed the green line and drove down the lower fork of the driveway marked on AW.  Seargant Martinez parked the vehicle ten to twenty feet west of a sweat lodge, in a cul de sac area, midway between between the studio outbuilding and the river.  The vehicle came to rest about 150 feet from the southeast corner of the house.[1]

No evidence was presented as to what Sergeant Martinez did while at Embudo.  Officer Schiel remained close to the car.[2]  Investigator Yontz walked north, towards the house, along a dirt footpath to view the front of the house which faces south.  She apparently got no closer than thirty or forty feet from the home when Investigator Romero called to her.  Investigator Romero,

---

[1] At least one witness testified that they parked closer, but in fact, more reliable evidence suggests that the true location of the parked police cruiser was further away.

[2] An unidentified male figure can be seen, on Defendant's video exhibit BE, on one of the sloped paths below and to the south of the house.

video camera rolling, walked a circuitous loop of part of the area.  From the car, she walked a short distance west, along the driveway, then moved east toward Defendant's teepee which is roughly 150 feet southeast of the house.  Then, she walked up the grade toward the home to a point fifteen to twenty feet from the east side of the home.  From there, she moved to the northeast, toward two cave or tunnel entrances which are between 100 and 150 feet from the home.  Upon finding the entrances, Investigator Romero called out to Yontz.  Yontz then joined Romero and confirmed the existence of the cave entrances.  Apparently the party of four then returned to Sergeant Martinez' car and they left the way they came.  At no time on October 6, 1999 did any of the four enter the residence, any of the outbuildings or the cave system.[3]  At no time on October 6, 1999 was any evidence seized nor was any evidence viewed with an eye towards subsequent seizure.

The analysis as to whether the four officers movements on October 6, 1999 in and around Defendant's Embudo house amounted to an invasion of curtilate must begin with the four factors the Supreme Court has identified for reference when defining the extent a residence's curtilage:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

United States v. Dunn, 480 U.S. 294, 301 (1987).  The "central inquiry," is whether the area claimed to be curtilage is intimately tied to the residence.  See United States v. Swepston, 987 F.2d 1510, 1514 (10th Cir. 1993).  At the same time, a subjective expectation of privacy is not controlling and the Fourth Amendment protects only what society recognizes as reasonable.  See

---

[3] Defendant based his written motion, in significant part, on his incorrect impression that officers entered his caves or tunnels on October 6.

Oliver v. United States, 466 U.S. 170, 179 (1984).

First, the area claimed as curtilage surrounds the house in question but is at times over 250 feet from it. Like the roughly 180 feet separating the barn from the rural home in Dunn, the distances at issue in this case case "support[] no inference that the [area claimed to be curtilage] should be treated as an adjunct of the house." Dunn, 480 U.S. at 302. That officer Romero may have come close to the house does not, by itself, mean the area is curtilage. See Knapp v. United States, 1 F.3d 1026, 1029 (10th Cir. 1993).

Second, the claimed curtilage lacks an enclosure. The fence composing portions of the western side of the purported boundary appears to be, at best, no more than the remnants of a former fence now in serious disrepair. While it is true that the Constitution does not demand fence building and maintenance by those enjoying its protections, for an area to be curtilage it must in some manner be enclosed. Defendant in part relies on the theory that the green line represents more of a natural enclosure. Certainly the Rio Grande forms a recognizable marker. It is less certain that the cliffs, or more accurately hillsides, to the west and north serve the same function. Some of the hills are quite steep. Yet in other places, the green line covers land that is flat, featureless and otherwise unremarkable from the land on either side. And even the more hilly sections of the green line are not distinct from any other nearby hills and do not form the impenetrable barrier Defendant alleges. Next, the section of this purported enclosure to the north of what has been described as a driveway entrance lacks few distinguishing features, manmade or otherwise. One lone unconnected post stands on the north side of the dirt drive opposite a gate not attached to anything, and a second post can be seen in the distance to the north. No vegetation tracks the alleged former fenceline or the boundary of the claimed curtilage. To the

5

south of the driveway is a free-standing dilapidated gate which was open on October 6, 1999.
The remainder of the fence south to the river is intermittent at best.  A few old fence posts can be
seen, with perhaps short strands of barbed wire in the dirt below.  Scrub brush grows at random
intervals in the vicinity of the green line but no continuous line of vegetation tracks it to the south
towards the river.  A thick stand of trees grows to the west of the house.  However, the tree
growth also does not track the green line.  "[F]or most homes, the boundaries of the curtilage will
be clearly marked . . . . "  Dunn, 480 U.S. at 294 (quoting Oliver,  466 U.S. at 182 n. 12).  In this
case they are not.

Third, while the area within the green line may be used for "intimate activities of the
home," Swepston, 987 F.2d at 1515, many of those uses in this case could fairly be characterized
as private activities made public.  Extensive testimony was presented concerning Defendant's use
of his tunnels and the area south of his home, up to and including the river.  Defendant hosts
parties and sleep-overs for his friends and neighbors in these places.  He, at least in the past,
bathed nude in the river and otherwise engaged while naked in activities within the claimed
curtilage.  Certainly these are, usually, private activities.  They are not, however, intimately
connected with the home.  Other activities such as driving on a driveway or parking a car, as
officers did, are neither private nor intimately connected with the home.  Moreover, others use the
area claimed to be curtilage for similar purposes.  Defendant, during October 1999, rented an
outbuilding within the green line to a tenant who was free to come and go with her guests as she
pleased.  He also permitted a neighbor, Lisa Law, to use his beach for nude bathing at her leisure.
Still further, claimed activities bearing close association with the house are confined to a
comparatively small portion of the area within the green line.  In sum, Defendant did not treat the

6

area claimed to be curtilage as part and parcel of his house and neither will this court.

Fourth, the area was not protected from observation by passersby.  A broken-down barbed wire fence does not obstruct view.  See Dunn, 480 U.S. at 303.  Neither does an open gate constructed of a few narrow boards with large gaps between each.   Nor does the Rio Grande obstruct view.  Defendant's claimed curtilage, and even part of his home, are visible from the state highway across the river.  At least one of Defendant's neighbors on his side of the river can see at least the roof of Defendant's home from off the property.[4]  Structures can also be seen across the river from within the green line.  In sum, I cannot agree that the area claimed as curtilage is sufficiently protected from view or that Defendant has taken sufficient steps to protect it from view, to qualify the space within the green line as an area the Fourth Amendment protects because of its intimate association with the home.[5]

That the area within the green line is not curtilage is not changed by the decisions from

---

[4] Defendant's motion to supplement the record with photographs taken from outlying vantage points will be denied.  These photos, obviously taken before early October by the full green foliage on the trees, are not indicative of the purported invisibility from outside during the autumn.  When the officers visited Defendant's Embudo house in early October 1999, the leaves on the trees had turned color and many leaves had already fallen.

[5] Defendant does not claim that the private signed dirt road leading up to the green line is curtilage.  Nonetheless, he put on extensive evidence about the presence of various "no trespassing" signs and the like along the road and before it reached the green line.  His theory is essentially that the net effect of the volume of signs on the road to the house serves to constructively shield the area from view.  In United States v. Roberts, the court rejected the idea that a private signed road is curtilage.  See 747 F.2d 537, 541-42 (9th Cir. 1984).  The court cited Oliver, 466 U.S. at 182, for the proposition that the test for whether one's privacy expectation is legitimate "'is not whether the individual chooses to conceal assertedly 'private' activity,' but 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.'"  Id. at 542.  The "no trespassing" signs in Roberts were thus insufficient to turn an unobstructed private road into an area for protected intimate activities.  See id.  Similarly, the signs in this case fail to protect the area down the road from view or to somehow cumulatively create curtilage at the end of the road.

other circuits on which Defendant primarily relies.  In <u>Daughenbaugh v. Tiffin</u>, 150 F.3d 594,

598-99 (6th Cir. 1998), the court found that a backyard and a garage fifty to sixty feet distant

from the home, surrounded by trees and a river, was curtilage.  In <u>United States v. Jenkins</u>, 124

F.3d 768, 773 (6th Cir. 1997) a wire-fenced backyard was curtilage where the defendants

gardened and hung laundry in that yard.  In <u>United States v. Reilly</u>, 76 F.3d 1271, 1276-78 (2d

Cir. 1996) a cottage the defendant used for sexual liaisons and which invited guests also used was

curtilage where the cottage was 375 feet from a rural home and was surrounded by a partially

fallen wire fence, supplemented with hedgerows on two sides and thick woods on a third.

Of these, the most similar is <u>Reilly</u>.  Yet even that case is distinguishable.  In <u>Reilly</u>, "the

appearance of the area made it readily apparent to observers that he area was private" in contrast

with this case.  Id. at 1279.  In <u>Reilly</u> the combination of man-made barriers (including trees

deliberately planted along the perimeter) and natural markers, <u>see id.</u>, were much clearer than

here, where virtually nothing advises visitors crossing the green line at the driveway that they have

just passed an important threshhold.[6]  The court in <u>Jenkins</u> noted that "[n]o one could mistake"

the garden arrangements and neatly mowed yard from the from the unkept open fields making up

the balance of the defendant's property.  <u>See Jenkins</u>, 124 F.3d at 773.  In this case the areas

within and without the green line all bear a similarly maintained, or unmaintained, appearance.  In

<u>Daughenbaugh</u> and <u>Jenkins</u> there was stronger evidence of protection from observation or steps

taken in that regard.  <u>See Daughenbaugh</u>, 150 F.3d at 600 (noting that garage in backyard could

_____

[6] Also in <u>Reilly</u>, the defendant, in the district court, argued that the unoccupied cottage has
its own curtilage.  The district court rejected that contention.  <u>See Reilly</u>, 76 F.3d. at 1274.  The
government here makes no argument that, because it was only occupied part-time, Defendant's
Embudo house has no curtilage.

not be seen except from within curtilage); <u>Jenkins</u>, 124 F.3d at 773 (noting the lack of visibility

from the nearest road).  In this case, aside from the wooded character of the land immediately

around the house and its remote location, Defendant's claimed curtilage is not particularly

protected from observation given that the area is in part visible from the paved state highway

across the river and in part visible from the private dirt road entering from the west.  Defendant's

steps in signing more distant parts of his property and not maintaining a wire fence enclosure are,

on balance, inadequate in comparison.

      In this jurisdiction, the Tenth Circuit has found that agents who walked into the

defendant's backyard, in close proximity to his house where they observed an electric meter, did

not encroach on the defendant's curtilage where that portion of the yard was not enclosed or

shielded from or used for intimate activities tied to the uninhabited house.  <u>See</u> <u>United States v.</u>

<u>Knapp</u>, 1 F.3d 1026, 1029 (10th Cir. 1993).  In another case, the Tenth Circuit found that a trailer

parked alongside a public alleyway was not within the defendant's curtilage where the area in

which the trailer was parked was not enclosed, the defendant had not attempted to shield it from

view, and it was not used for the intimate activities of the home given that it was used for trash

storage.  <u>United States v. Long</u>, 176 F.3d 1304, 1308 (10th Cir. 1999).  This controlling authority

suggests that the vast, poorly demcarcated area, used at times in a public manner, marginally

protected from view, and which Defendant did not attempt to protect from view, is not curtilage.

      B.     Officers limited purpose was reasonable

      Even if the area within the green line on Exhibit AW is curtilage, the motion to suppress

should still be denied.  In <u>Roberts</u>, the Ninth Circuit found that a violation of a defendant's

curtilage did not necessarily result in suppression of evidence where the intrusion was one society

recognizes as reasonable.  See Roberts, 747 F.2d at 542-43.  In that case, officers acting on a tip

and without a warrant, traveled down a private dirt road clearly marked as private and which

officers knew to be private.  They parked ten feet from the house matching the tipster's

description.  The house lacked a driveway so they parked in a portion of the lawn where cars had

obviously traveled in the past.  One officer left the car, knocked on the door of the house and

asked for directions.  After the officer spoke to the occupant, the officer returned to his car and

both officers left.  The tipster's information confirmed by the officer's visit and the details of the

visit were included in a subsequent warrant affidavit.  The Ninth Circuit found that the officers'

approach to the door of the residence violated the Fourth Amendment.  However, their open and

peaceable approach with the honest intent of asking questions cured any constitutional violation.

      This case is somewhat similar.  Officers visited the Embudo home on October 6, 1999

only to further particularize a description for the warrant, as demanded by the Fourth

Amendment.[7]  They already had probable cause for the search they planned to conduct on

October 7, 1999.  Officers seized no evidence on October 6, 1999 and conducted their subsequent

search on October 7, 1999 with a warrant.  As in Roberts, the officers here had a legitimate

purpose for their visit, which society should recognize as reasonable.  Roberts indicates that

when, as here, officers' intentions are legitimate, the fruits of their efforts should not be

suppressed.  Stated another way, the presence of an officer in one's curtilage does not

automatically result in a unconstitutional invasion.  See, e.g., United States v. Brady, 734 F. Supp.

---

[7] To adopt Defendant's view of the law and version of the facts would be to allow the
creation of a class of places to be searched that are in effect always unsearchable because only the
defendant can particularly describe them.  The Fourth Amendment should not give rise to such a
result.

923,  n. 9 (E.D. Wash. 1990) (citing State v. Seagull, 632 P.2d 44 (1981) (applying state law)).

        C.     Officers had an independent source of the description

        Alternately, even if the officers invaded Defendant's curtilage and that invasion is not permitted in spite of its constitutionally prescribed purpose, the evidence later seized should not be suppressed because the officers had an independent source of the information included in the warrant.  See Murray v. United States, 487 U.S. 533, 537 (1988) (describing policy of independent source doctrine).  The parties agree that the independent source doctrine, most often applied in the context of probable cause inquiries, would apply to the description in an affidavit to a search warrant.  Applying that doctrine, I find that, if officers invaded Defendant's curtilage when they crossed the green line, the evidence at issue should not be suppressed because they had a sufficient description of Defendant's house before they crossed that green line.

        The descriptor paragraph reads as follows:

> Single story residence located on a hill in Embudo, Rio Arriba County, New Mexico.  The residence is located on the west side of the Rio Grand [sic] River.  It can be reached by turning west off Hwy 68 at the Embudo Station, continuing on the dirt road and taking the left fork, continuing until the road ends at a group of structures near the river.  The residence has tan stucco on the sides, windows along the entire front, solar panels on the roof, and antlers over the top of the front door.  There is a large black satellite dish on the hill above the house.  Mannequins can be seen in the front windows.  There is a series of caves in the hill that originate from the house.

        The officers could see, before they crossed into the area Defendant claims as curtilage, nearly all of the details listed in the descriptor paragraph of the affidavit.  The facts adduced at the hearing show that the house was visible in early October 1999 from state highway 68 across the river and that Officer Schiel had seen it from that vantage point earlier.  Moreover, the house was visible, although not in sparkling detail, from the Campos residence at the end of an adjacent fork

in the dirt road.  Still further, the house could be seen from the threshold of the claimed curtilage.
It could thus be classified as single story before officers advanced onward beyond the green line.
That the house was in Embudo, on the west side of the predominantly north-south flowing Rio
Grande was already known.  The directions to the house were known once Defendant officers
reached the green line.  The tan stucco on the sides, at least a part of the windows in the front, the
solar panel on the roof, and the black satellite dish on the hill were all visible from the green line.
Officers knew from the interviews that prompted the October 7, 1999 search that the house had a
network of caves or tunnels associated with it and that there was at least one mannequin in the
house.[8]  All of the details of the home, other than the existence of the antlers over the front door,
were known to officers before any encroachment of curtilage took place.  While officer Yontz
may have believed she needed to find the location of the cave entrances in order to sufficiently
particularize the affidavit to the warrant, in fact she did not.  The balance of the descriptor
paragraph sufficiently describes the place to be searched to avoid a general search, see United
States v. Dahlman, 13 F.3d 1391, 1394 (10th Cir. 1993), and to enable a prudent officer to locate
the house, see United States v. Rogers, 150 F.3d 851, 855 (8th Cir. 1998).  Moreover, the
sentence in the affidavit mentioning caves does so only to note that they originate from the house-
-a detail known before the officers' visit on October 6, 1999.

   IT IS THEREFORE ORDERED THAT Defendant's motions to supplement the record

---

[8] It is also worth noting that all of the information in the affidavit's descriptor was
available from viewing the house while on the lower fork of Defendant's dirt driveway which
officers traveled before parking near a stand of trees by the studio.  The part of the drive from
which the house could be seen within the green line was not within the area in which Defendant
actually engaged in the activities he claims are intimately associated with the activities of the
home.

(Doc. No. 62) and to suppress (Doc. No. 27) are denied.


_____
**UNITED STATES DISTRICT JUDGE**

13